UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
----------------------------------------------X

UNITED STATES OF AMERICA

-v-                                           Hon. Madeline Cox Arleo
                                              20 Cr. 864 (MCA)
MARKELL BROWN, et al.

     *Defendants.*

----------------------------------------------X


**DEFENDANT MARKELL BROWN'S OPPOSTION
TO THE GOVERNMENT'S *IN LIMINE* MOTIONS
<u>AND IN SUPPORT OF HIS OWN *IN LIMINE* MOTIONS</u>**

### <u>Preliminary Statement</u>

Defendant Markell Brown ("Brown") opposes the Government's *in limine* motions: (1) to admit rap lyrics by co-defendant Terence Shaw ("Shaw") (Gov't Mot., Point I) (*see* Brown Point I); (2) for an anonymous, escorted, and partially sequestered jury (Gov't Mot., Point V) (*see* Brown Point II); (3) to shackle defendants (Gov't Mot., Point VI) (*see* Brown Point III); (4) to introduce Brown's prior conviction under Federal Rule of Evidence 609(a) if he testifies at trial (Gov't Mot., Point III) (*see* Brown Point IV); and (5) to permit summary witnesses (Gov't Mot., Point VII) (*see* Brown Point V); As for the Government's remaining *in limine* motions: (1)

defense counsel understands its obligations under the Federal Rules of Evidence and need not respond to the Government's motion to bar reference to consequences of a conviction (Gov't Mot., Point II); and (2) Brown does not oppose the Government's use of a medical examiner who did not conduct the autopsies (Gov't Mot., Point IV).

In addition, Brown moves *in limine* to preclude: (1) law-enforcement witnesses from providing expert testimony (*see* Brown Point VI); (2) admission of <u>all</u> autopsy and <u>selected</u> crime-scene photographs (*see* Brown Point VII); (3) Government Exhibits 320, 321, 322, and 323 – jail recordings involving third parties (*see* Brown Point VIII); and (4) Government Exhibit 37 – interview of Tyrell Franklin (*see* Brown Point IX). He also previously moved to preclude the Government from introducing recently taken photographs of the defendants' tattoos, which counsel opposed by a separate letter to the Court dated September 24, 2025, attached hereto as Exhibit A, and ask that the Court incorporate that opposition as part of these *in limine* motions. Finally, we seek permission to file additional motions as may be necessary (*see* Point X).

## BROWN'S OPPOSTION TO THE
## GOVERNMENT'S *IN LIMINE* MOTIONS

### Point I

### The Court Should Preclude
### Excerpted Rap Lyrics By Co-Defendant Shaw

**1. Admission Against Brown Violates the Confrontation Clause**

According to the Government, Shaw's lyrics: (1) recount the crime ("plotting to catch an opp, plotting the perfect drill"); (2) address his relationship with Brown (whom he refers to as "Say," short for Brown's nickname, "Sayboy"), directly tying Brown as a co-conspirator; and (3) express his remorse over co-conspirator Quadel Chisolm's death. *See* Gov't Mot. at 4-5. These lyrics are testimonial because they amount to "solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some fact." *Crawford v. Washington*, 541 U.S. 36, 51 (2004).

As the Third Circuit explained, testimonial statements include "affidavits, custodial examinations, prior testimony … or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." *United States v. Hendricks*, 395 F.3d 173, 179 (3d Cir. 2005). Under *Crawford*, testimonial statements by a witness who is not subject to cross-examination violate the Confrontation Clause.

### 2.  Admission of Shaw's Rap Lyrics Creates a *Bruton* Issue

In addition, the admission of the rap lyrics creates a *Bruton* issue for Brown. In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that admission of a co-defendant's confession directly implicating another trial defendant violates the Confrontation Clause, even with a limiting instruction. The Court recognized that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great" that no cautionary charge suffices. *Id*. at 135.

The Government may invoke *Samia v. United States*, 599 U.S. 635 (2023), to argue that neutral redactions cure Confrontation Clause issues. But *Samia* is inapposite. There, the confession used generic language ("the other person") that did not directly identify the defendant. The Court expressly limited its holding to confessions that "do not directly inculpate" a co-defendant. *Id*. at 647. Shaw's lyrics, by contrast, cannot be redacted into neutrality: they name Brown ("Say"), describe him as Shaw's "brother," and recount their joint planning. This is precisely the kind of "powerfully incriminating" statement *Bruton* forbids. *See also Gray v. Maryland*, 523 U.S. 185, 196 (1998).

The Third Circuit has consistently enforced *Bruton*. See *United States v. Gibson*, 826 F.2d 1020 (3d Cir. 1987) (statements that "obviously refer"

to a co-defendant violate *Bruton* even without naming them); *United States v. Logan*, 717 F.3d 410 (3d Cir. 2013) (core concern of *Bruton* is preventing convictions based on uncross-examined testimony). Shaw's lyrics go further – they explicitly name Brown and allegedly describe their criminal planning.

Therefore, exclusion of the rap lyrics in a joint trial is required.

### 3. Severance is Required if Shaw's Lyrics Are Admissible

Under Fed. R. Crim. P. 14(a), if joinder "appears to prejudice a defendant," the Court may order severance. The Third Circuit applies a two-step test: (1) whether a defendant will suffer prejudice from joinder; and (2) whether that prejudice outweighs the efficiency benefits of a joint trial. *United States v. Voelker*, 489 F.3d 139, 145 (3d Cir. 2007). The burden is on the moving party, but where Confrontation Clause violations are unavoidable, severance is required. *United States v. Console*, 13 F.3d 641, 656 (3d Cir. 1993). No limiting instruction could prevent the jury from understanding Shaw's lyrics as a confession that Brown committed the crimes with him. In such circumstances, severance is the only remedy. *See United States v. Sandini*, 888 F.2d 300, 308 (3d Cir. 1989).

While *Zafiro v. United States*, 506 U.S. 534 (1993), held that antagonistic defenses are not prejudicial *per se*, severance is warranted when

they create specific prejudice. Here, Shaw's lyrics function as testimony against Brown while portraying Shaw as remorseful.

The Third Circuit recognized severance is necessary where defenses become "weapons against each other." *United States v. Cerezo*, 794 F.2d 83, 89 (2d Cir. 1986). Other circuits have likewise mandated severance where co-defendant statements irreparably prejudice joint trials. *See United States v. Johnson*, 478 F.2d 1129, 1131 (5th Cir. 1973) (severance required where confession "laid the blame" on co-defendant); *United States v. Ramirez*, 710 F.2d 535, 547 (9th Cir. 1983) (severance required when defenses are "irreconcilable and mutually exclusive").

Shaw's lyrics create precisely that situation. His statements bind Brown to the charged crimes in a way that cannot be untangled. Severance is therefore the only means of safeguarding Brown's constitutional rights.

## Point II

### The Government's Motion for an Anonymous Jury and Partial Sequestration Should Be Denied

#### 1. The Jury Should Not be Anonymous

Brown's objections to an anonymous jury fall into two categories: (1) an infringement on the presumption of innocence; and (2) an impairment of the right to exercise peremptory challenges.

The parties agree that the decision whether to empanel an anonymous jury or order heightened security measures is within the discretion of this Court. *See*, *e.g.*, *United States v. Thornton*, 1 F.3d 149, 153 (3d Cir. 1993); *see also United States v. Shyrock*, 342 F.3d 948, 970 (9th Cir. 2003) (noting that every Circuit to address the issue has held that empaneling an anonymous jury is within trial court's discretion). But, empaneling an anonymous jury and sequestration are drastic measures that are justified only when the Government can establish, they are "genuinely called for." *United States v. Vario*, 943 F.2d 236, 239 (2d Cir. 1991); *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1034 (11th Cir. 2005) (the use of an anonymous jury is a "drastic measure" that implicates the defendant's constitutional rights and, therefore, "should only … [be used] in limited and carefully delineated circumstances."); *see also United States v. Thai*, 29 F.3d 785, 801 (2d Cir. 1994); *Shryock*, 342 F.3d at 971 (an anonymous jury is discouraged unless there is a "strong reason" to believe the jury needs protection); *United States v. Walker*, 392 F.App'x 919, 924 (3d Cir. 2010) (noting "numerous threatening and violent remarks" made by defendant threatening witnesses, their families, and prison guards, and intimidating jurors).

A trial court must take precautions "to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are

protected." *United States v. Talley*, 164 F.3d 989, 1001 (6th Cir. 1999), *quoting*, *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991); *United States v. Thomas*, 757 F.2d 1359, 1365 (2d Cir. 1985) (Second Circuit has consistently held that this deviation from standard methods of jury selection is permissible only under circumstances where there is a showing by the Government of a "strong reason to believe the jury needs protection").

Similarly, the Third Circuit cautioned that the "probable merits of the anonymous jury procedure are worthy, not of presumption of irregularity, but of disinterested appraisal by the courts." *United States v. Scarfo*, 850 F.2d 1015, 1017, 1023 (3d Cir. 1988) (granting the motion based upon the "unusual" circumstances, in which judges presiding over related matters had been subject to bribery attempts and one judge had been murdered). Indeed, limiting the use of anonymous juries is required not only to safeguard defendants' rights to a fair trial, including an effective jury-selection process, but also in order to maintain the integrity of the judicial system, which "benefits from a presumption of public access to jurors' names." *United States v. Wecht*, 537 F.3d 222, 237-38 (3d Cir. 2008).

At the outset, we note that the Government's suggestion that "[a]nonymous juries have been consistently utilized in cases in this District

8

involving organized crime and street gangs" is a broad overstatement. Gov't Mot. at 22, n.4. There are numerous examples in this District of cases involving organized crime and street gangs that did not involve the use of an anonymous jury. For example, the defendants in *United States v. Reyes-Villatoro*, et al., Crim. No. 13-615 (SRC) (DNJ), were members of MS-13, an international criminal organization involving notoriously violent street gangs with a reach stretching from California to New York, Canada to Central America. That case involved five murders, a plot to kill a police detective, allegations that witnesses have been threatened, the need to place several cooperating witnesses in the wit-sec program, one person murdered in part because of suspicions that she was cooperating, and numerous witnesses who testified that they feared the defendants and MS-13. The Government's request for an anonymous jury was denied. In *United States v. Roland*, Crim. No. 12-298 (DNJ), the defendant was charged with seven murders (five capital, one non-capital, and one charged solely as a RICO Act) and one murder was alleged to have occurred because the victim was suspected of cooperating. The court denied the Government's request for an anonymous jury. *See also United States v. Lombardi*, et al., Crim. No. 92-171 (MTB) (DNJ) (denying Government's motion for an anonymous jury).

### a. An Anonymous Jury Will Infringement on the Presumption of Innocence

Contrary to the Government's contention, the empaneling of an anonymous jury is consistently deemed a drastic remedy that federal courts, including the Third Circuit, view as "the rare exception rather than the norm." *Wecht*, 537 F.3d at 237. An anonymous jury in this case would unfairly impinge upon Brown's right to the presumption of innocence. An anonymous jury would poison the atmosphere of the case and serve to bolster the Government's proof by creating the impression, before any evidence is elicited, that the defendants are dangerous and guilt. Therefore, the Government's motion should be rejected in favor of less extreme measures that may be required to protect juror's privacy.

The Government's proposed heightened security measures (often referred to as, partial sequestration) on top of jury anonymity would cast an even greater unjustified shadow of fear over every potential juror in this trial because there is no basis in Brown's past conduct or in the nearly nine years since the charged murders, mostly spent in pretrial detention, to support the Government's prophylactic measures to protect jurors from an unsubstantiated danger.

Other courts have noted, the use of an anonymous jury compromises a defendant's Fifth Amendment right to a presumption of innocence "by

raising the specter that the defendant is a dangerous person from whom the jurors must be protected." *Ochoa-Vasquez*, 428 F.3d at 1034; *see also United States v. Lawson*, 535 F.3d 434, 441 (6th Cir. 2008) (noting likelihood of "instances in which an anonymous jury is empaneled in such a way as to jeopardize constitutional rights – such as the right to a presumption of innocence"); *Shryock*, 342 F.3d at 971 ("anonymous juries may infer that the dangerousness of those on trial required their anonymity, thereby implicating defendants' Fifth Amendment right to presumption of innocence"). Indeed, even the *Scarfo* case, relied upon throughout the Government's motion, expresses concern for the implications of an anonymous jury on the presumption of innocence, calling for adequate precautions to assure that anonymous juries not be "intrinsically suggestive" of guilt. *Scarfo*, 850 F.2d at 1023-24, 1026.

The Government lists cases where anonymous juries have been ordered. Although it is a "drastic measure" "rarely used," we do not dispute that there is ample precedent for its use in the past. What the Government seemingly ignores, however, is that each case it cited presented unique facts that warranted an anonymous jury – facts that do not exist here. A case-specific evaluation is required before a Court can order an anonymous jury

and heightened jury security measures. The Government has failed to proffer a sufficient basis for the Court to find that an anonymous jury is required.

### b. An Anonymous Jury Will Impair Defendants' Right to Effectively Exercise Peremptory Challenges

As the case law makes clear, juror anonymity also risks infringing upon a defendant's Sixth Amendment right to an impartial jury by impeding his ability to root out bias or exercise peremptory challenges during *voir dire*. *See Wecht*, 537 F.3d at 242 ("one of the purposes of access to jurors' names is to make … investigation [into whether the jury is biased against an infamous defendant] possible"); *Ochoa-Vasquez*, 428 F.3d at 1036 ("juror anonymity deprives the defendant of information that may be helpful in making appropriate challenges … thereby implicating defendants' Sixth Amendment right to an impartial jury"); *United States v. Mansoori*, 304 F.3d 635 (7th Cir. 2002) (juror anonymity "makes it more difficult for the defense … to make intelligent decisions as to which prospective jurors should be challenged or stricken peremptorily). Jurors sometimes lie to get out of jury service, but more importantly they sometimes lie or minimize facts in their background when they want to serve. Even a juror's entirely innocent intention, expressed during *voir dire*, within the context of an anonymous jury, infringes upon the defendant's ability to investigate the veracity of the responses made by a juror during the selection process. On the other hand,

*voir dire* of a non-anonymous juror permits a fairer scrutiny of the juror's statements to ensure that causal and peremptory strikes are based on more accurate information.

A large portion of the jury pool actively participates on social media sites such as Facebook, Instagram, X, and Tick Tock. Reviewing a prospective juror's public social media accounts can lead to invaluable information about a juror. That information can lead to meaningful use of the defendant's peremptory challenges and possibly arguments in support of a "for cause" removal of a prospective juror. People often say things on social media that they would be reluctant to say in an open forum, such as jury selection. People are much more willing to expose their biases on social media than in face-to-face conversations. Ordering an anonymous jury will deprive Brown of a fair trial because he will be denied a meaningful opportunity to investigate juror bias.

### c.  Factors Do Not Support Empaneling an Anonymous Jury

The cases that have upheld the use of an anonymous jury have only done so because of the existence of particular facts that justified the burden placed on the rights of the defendant. Those facts, however, are not present in this case.

The Government correctly identifies four factors that the Third Circuit has found relevant to determining the propriety of empaneling an anonymous jury: "(1) pretrial publicity from prior related cases that may contribute to juror apprehension; (2) any history of violence by the defendant; (3) the severity of the charges facing the defendant; and (4) any claims that the defendant previously intimidated witnesses." Gov't Mot. at 25, *citing*, *Thornton*, 1 F.3d at 154, *Scarfo*, 850 F.2d at 1023-24.

### i. There is No History of Violence by the Defendants to Warrant an Anonymous Jury and Sequestration

The Government does not site any history of violence by the defendants other than the alleged course of conduct charged in the Indictment. Relying solely on the charged conduct would mean that every murder-in-aid of racketeering charge prosecution would include a presumption for an anonymous jury and provide lip service to the long-standing legal principle that an anonymous jury is a "drastic measure" that should be "rarely used."

### ii. Severity of the Charges Facing Defendants and Allegations of Witness Intimidation

Brown and Shaw are charged with serious crimes. They are alleged to have participated in three murders during a single course of alleged conduct. Neither defendant, however, is alleged to have threatened or tampered with

witnesses in relation to this prosecution, and has never been alleged to have tampered with jurors in any prior trial. In fact, portions of the pretrial discovery provided to the defendants several years ago contain the names and statements by potential co-conspirators. The Government has not reported a single instance where these witnesses were intimidated, threatened, or otherwise tampered with. Therefore, there is no valid reason for the Court to conclude jurors should fear for their safety.

When comparing the allegations of this case to the allegations in *United States v. Reyes-Vellatoro*, one must seriously consider whether the instant motion is nothing more than the Government's attempt to improperly stack the deck in favor of guilty verdicts, rather than its purported, non-specific security concerns for juror safety. *Reyes-Villatoro* involved MS-13, a notoriously violent gang with a reach infinitely greater than the enterprise alleged here. Furthermore, MS-13 has a lengthy history of witness intimidation. The *Reyes-Villatoro* case itself involved a plot to kill a police detective, allegations that witnesses have been threatened, the need to place several cooperating witnesses in the wit-sec program, one person murdered in part because of suspicions that she was cooperating, and numerous witnesses who testified that they feared the defendants and MS-13 (not to

mention five specific murders). Despite those compelling, case-specific circumstances, the Government did not request an anonymous jury.

The seriousness of the charges against the defendants does not support the highly prejudicial protective measures sought by the Government in this case. While the Government's unexplained and unsupported allegations may raise concerns, they are irrelevant to the question of whether jurors face any actual or potential danger. Standing alone, the bare allegations presented by the Government should not form the basis for its requested relief. Instead, the Court should compel the Government to make a detailed proffer, on the record, establishing that the jury has specific cause for concern before it considers granting the relief requested.

The Government alleges that the Neighborhood Bloods ("NHB"), the criminal enterprise charged in the Indictment, is capable of retaliating against cooperating witnesses is merely speculative and without support. Notably, it broadly and boldly asserts that NHB "<u>was</u> also known to undermine the criminal justice system by intimidating and threatening house thought to be cooperating with law enforcement," (emphasis added, highlighting the use of the past tense) (Gov't Mot. at 27), "threatening to kill or otherwise retaliate against anyone it perceives as cooperating with or assisting law enforcement," (Gov't Mot. at 29) and made unspecified

"[a]ttempts to silence or intimidate witnesses who are prepared to testify against members of the charged enterprise" (*id*.) without providing (even *ex parte*) any supporting evidence. In the hundreds of hours of jail recordings of numerous purported NHB members, including calls involving Brown, the Government does not, and cannot, direct the Court to a single conversation in which any such threats were made. The Government cannot counter that the participants took measures to conceal or avoid speaking of retaliation against cooperating witnesses during recorded communications, while also arguing that during these same or similar calls the defendants, made incriminating "admissions" about their roles in the charged offenses.

### iii.  Pretrial Publicity Will Not be a Factor

There is always a chance that media coverage could impair a juror's ability to be fair and impartial. The defense, however, does not believe that an anonymous jury would be immune from the potential prejudice of media attention. Moreover, the Government's concerns about insulating jurors from media coverage appear invalid given that the media attention in this case has not been extensive.

The cases are legion in which courts have declined to utilize the procedure proposed by the Government here, despite them having far more notoriety. *See*, *e.g.*, *United States v. Mostafa*, 7 F.Supp.3d 334, 336 (SDNY

2014) (denying anonymous jury in case involving hostage taking, terrorist training camps, and a defendant who inspired acts of terror throughout the world); *United States v. Edwards*, 303 F.3d 606, 613 (5th Cir. 2002), *quoting, United States v. Branch, 91 F.3d 699*, 723-24 (5th Cir. 1996) ("not all celebrated trials merit an anonymous jury.").*United States v. Blagojevich*, 612 F.3d 558, 559 (7th Cir. 2010) (noting trial court did not order juror anonymity in ex-governor's corruption trial).

There is no reason to believe that a jury properly instructed to ignore the media will refuse to follow those instructions. *See United States v. Urban*, 404 F.3d 754, 776 (3d Cir. 2005), *citing, Zafiro v. United States*, 506 U.S. 534, 540 (1993) ("We presume that the jury follows [limiting] instructions."). In fact, the danger of a juror ignoring the Court's instruction not to follow any media coverage of the case suggests significantly greater prejudice to the defendants. Nor should the Court presume that the media will seek to invade the privacy of the jurors. *See Wecht*, 537 F.3d at 240, 242 (the prospect that the press might publish background stories about the jurors is not a legally sufficient reason to overcome the presumption that jurors' names are public information).

On the other hand, the specter of an anonymous jury is what most threatens juror impartiality. Jury anonymity, in and of itself, carries the

potential to taint the jurors' opinions about the defendant. Granting anonymity will only heighten any real or perceived dangers that the jury might feel as a result of any media attention that this case will garner. Jurors will think, because of the jury anonymity and the media attention, that even the Court believes the allegations in the indictment are true. If the media attention expands before or during trial, the danger of the media's biasing effect will be significantly heightened if the Government's motion is granted rather than the Court simply including questions during *voir dire* specifically designed to ferret out any jurors who fear for their safety.

There are less burdensome means available to protect the jury from being subjected to unwanted media attention. To the extent that this Court feels it is necessary to keep the names of jurors from the public record, Brown would not object to a procedure that allows the parties access to the names and other information concerning the jurors while withholding that information from the public record. Such a procedure would shield the jury from the media without implying that the jury has something to fear if the defendant and defense counsel learn their identities. *See ABC, Inc. v. Stewart*, 360 F.3d 90, 105 (2d Cir. 2004) (in reversing the trial judge's decision to close voir dire to the media to protect potential jurors' privacy in the prosecution of Martha Stewart, the Second Circuit noted that the

concerns for juror privacy could have been accomplished by "simply concealing the identities of the prospective jurors" from the media).

### d.  Less Prejudicial Alternatives Available

Assuming, *arguendo*, that the Court finds that there is sufficient need to "protect" the jury, alternative, less prejudicial procedures to those proposed by the Government could be employed without compromising the concerns of the Court. The Court could balance the perceived need to protect the jurors with the defendants' Constitutional rights by withholding the jurors' names, addresses, and places of employment from the defendants themselves, but not from their counsel.  Such a procedure – although not warranted under the facts of this case – would be far preferable to the wholesale anonymity proposed by the Government.  The jury would be protected and the inherent prejudice to the defendants would be greatly minimized were the Court to issue a protective order precluding defense counsel from sharing the juror information with their clients.

The Court can adopt a method of semi-anonymity by withholding only the first names of the potential jurors, while revealing their surnames. *See, e.g., United States v. Melendez*, 743 F.Supp. 134, 138-39 (EDNY 1990). Notably, in *Melendez*, the court applied that procedure despite allegations that the defendants had threatened law-enforcement personnel, various

government witnesses, and even the prosecutors – allegations far more direct and severe than those which the Government makes in the instant case.

Either of these alternatives, or a combination of the two, would more than amply alleviate any potential concerns of the Court, while at the same time minimize the inherent prejudice to the defendants.

Brown would not object to a similar order to include a prohibition from any person having contact with jurors. Nor would he object to the jury being informed of such an order with instructions from the Court to report any violation of that order.

### 2. The Jury Should Not Be Escorted or Partially Sequestered

In the absence of the strong showing of an actual need for protecting the jury, this aspect of the motion should also be denied. These measures can engender even more fear on the part of jurors. *United States v. Milan-Colon*, 834 F.Supp. 78, 83 (SDNY 1993) ("[i]ronically, the very relief that the Government now seeks, which includes sequestering the jury at all recesses, is likely to engender fear on the jurors' part that they are in danger."). The tandem prophylactic measures requested by the Government are likely to send a clear message to the jury that they are in danger from the defendants and that the Court has decided that jury safety cannot be assured otherwise. If jurors are escorted to a criminal trial the only logical conclusion they can

reach is that the defendants are dangerous. Moreover, any instruction to the jurors indicating that such procedures are being employed for the reasons proposed by the Government would be worthless because prominent in a juror's mind will be the thought "these defendants must be very dangerous."

Brown's right to a fair trial should not be placed in jeopardy absent the predicate showing of very good reasons to believe the jury actually needs protection.

## Point III

### The Government's Offered No Particularized Findings Warranting the Extraordinary Remedy of Shackling Defendants During the Trial

It is well settled that shackling a defendant during a trial is an extraordinary measure and should be used only as a "last resort." *Illinois v. Allen,* 397 U.S. 337, 344, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970). The Supreme Court, in *Deck v. Missouri,* 544 U.S. 622, 629 (2005), noted that shackling a defendant is inherently prejudicial because it implicates three fundamental legal principles: (1) the presumption of innocence; (2) the right to counsel, including the right to participate in one's defense and the right to testify; and (3) judicial responsibility for the dignity and decorum that preserves the judicial process." *Id*. at 629.

The Government concedes that neither a district court nor the United States Marshals Service can adopt a "'general'" or "'routine'" policy of

shackling defendants during trial. Gov't Mot. At 19 (*citing*, *Deck v. Missouri*, 544 U.S. at 626; *United States v. Salehi*, 187 F. App'x 157, 174 (3d Cir. 2006)). Nonetheless, it requests that the Court make particularized findings on the record to support shackling the defendants during trial.

The Government, however, has not offered a particularized set of allegations related to these defendants that would support the need for them to be shackled during the trial. It has not offered any facts suggesting the defendants will be violent or will engage in inappropriate behavior during the trial to support shackling of these defendants.

The Government has failed to meet its burden to warrant the extraordinary measure of shackling a defendant during trial.

## Point IV

### The Court Should Precluded Evidence of Brown's Prior Conviction Under Fed. R. Evid. Rule 609

If Brown testifies at trial, the Government intends to impeach him with his prior December 17, 2017 conviction for possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). (Gov't Mot., at 11). The defense, however, argues that this conviction is not probative of his "character for truthfulness" and is otherwise too close to the charged offenses that it would unfairly prejudice the jury.

Under Fed. R. Evid. 609, evidence of a prior felony conviction is admissible against a testifying witness only for impeachment purposes. *United States v. Caldwell*, 2014 U.S. App. LEXIS 14174, 47 (3d Cir. 2014). If the testifying witness is also the defendant in a criminal trial a heightened balancing test is applied, and evidence of prior convictions is admitted only "if the probative value of the evidence outweighs its prejudicial effect to that defendant." *Id*. (quoting Fed. R. Evid. 609(a)(1)(B)); *see also United States v. Martinez*, 555 F.2d 1273, 1275 (5th Cir. 1977) (finding that the "danger of unfair prejudice is far greater when the accused, as opposed to other witnesses, testifies, because the jury may be prejudiced not merely on the question of credibility but also on the ultimate question of guilt or innocence."). Thus, the structure of this balancing test has been observed to create a "predisposition toward exclusion." *Caldwell*, 2014 U.S. App. LEXIS 14174 at 47 (quoting Wright & Gold, *Federal Practive and Procedure* § 6132, at 216. Furthermore, when offering prior convictions for impeachment purposes against a testifying defendant, the Government who bears the burden of persuasion in fulfilling this heighted balancing test. *Id.* at 56.

The Third Circuit recognized four factors in determining whether or not to admit prior conviction evidence for impeachment purposed under

Rule 609(a)(1)'s heightened balancing test: "(1) the kind of crime involved; (2) when the conviction occurred; (3) the importance of the [defendant's] testimony to the case; [and] (4) the importance of the credibility of the defendant." *Caldwell,* at 47-48 (quoting *Gov't of Virgin Islands v. Bedford*, 671 F.2d 758, 761 n.4 (3d Cir. 1982).

Evaluation of the first factor, the kind of crime involved, requires a court to look at the prior convictions "similarity to the charged crime." *Id*. at 48. The more similar the prior conviction is to the crime for which the defendant is being tried, the further the balance tilts toward exclusion, as such evidence will undoubtedly prejudice him. *Id*.

Here, Brown will be facing trial for the murder of three individuals – Murder Conspiracy (Count One) and Murder In Aid of Racketeering (Counts Two, Five and Eight) – and weapons related offenses resulting from the same course of conduct – Discharge of a Firearm During a Crime of Violence (Counts Three, Six and Nine); and Causing Death Through Use of a Firearm (Counts Four, Seven, and Ten). Though he is not on trial for an 18 U.S.C. § 922(g)(1) offense, there is such a strong similarity between that prior conviction and the present matter, that the danger of unfair prejudice to him is palpable.

Moreover, a limiting instruction cannot mitigate any prejudice to Brown. It is a fallacy to suggest that the jury will be able to avoid drawing an inference between his past convictions, including a possessory weapons offense, and the similar ones for which Brown is currently charged, despite any instruction offered. *See United States v. Sanders*, 964 F.2d 295, 297-98 (4th Cir. 1992). There are heightened concerns here because the very offense the Government seeks to use as impeachment – possession of a firearm by a convicted felon – are typically bifurcated at trials when charged as a substantive offense because the very nature of the charge requires the disclosure of an additional, prior felony conviction. *See Model Criminal Jury Instruction* 6.18.922G-1.

Additionally, a major component of a defendant's election to testify is based in part on whether his prior convictions will be admitted against him for impeachment purposes. As the Government alluded to in its argument for an anonymous jury, it likely will call Brown's alleged co-conspirators to testify against him in the present matter. If so, his testimony may be fundamentally important to his defense. "If it is apparent to the trial court that the accused must testify to refute strong prosecution evidence, then the court should consider whether, by permitting conviction impeachment, the court in effect prevents the accused from testifying." *Caldwell*, at 52

(quoting Glenn Weissenberger & James J. Duane, *Weissenberger's Federal Evidence* § 609.2 (4th ed. 2001)).

Here, depending how the Government's proofs on its direct case, Brown may need to take the stand because the jury will ultimately be required to choose between his version of the events and those of his alleged co-conspirators. The Government argues that, because there "are no eyewitnesses to the murders and no evidence depicting the murders," Brown's testimony will not be important to the determination of the case. (Gov't Mot., at 15). The defense disagrees. In fact, given the Government's seeming acknowledgement of the circumstantial nature of its case, the defense submits Brown's testimony may become even more important that should weigh against admission of his prior conviction.

Accordingly, the Court should exclude and evidence of his prior conviction should Brown elect to testify.

## Point V

### The Government's Request to Call Summary Witnesses Should Be Evaluated on a Witness-By-Witness Basis at Trial

Summary witnesses are permissible in certain circumstances pursuant to the Federal Rules of Evidence. Without knowing, however, what testimony the Government intends to summarize during the course of the trial, defense counsel cannot make a proper objection and the Court cannot

make a proper ruling. Therefore, we reserve the right to object to any summary witnesses the Government may call during the trial. Should the Court ultimately permit a summary witness, we also reserve the right to request a limiting instruction either before or after the testimony of any summary witness, in order to instruct the jury of the purpose of the summary witness. *See United States v. Lemire*, 720 F.2nd 1327, 1347 (D.C. Cir. 1983).

## BROWN'S *IN LIMINE* MOTIONS

### Point VI

### Law Enforcement Witnesses Should Be Precluded From Giving Expert Testimony

The Government, in its July 15, 2025 expert notice ("Expert Notice"), stated its intention to offer expert testimony from these law-enforcement witnesses: (1) Hudson County Prosecutor's Office Captain of Detectives Matthew Stambuli; (2) Hudson County Prosecutor's Office Lieutenant Aedan Stabile; (3) Hudson County Prosecutor's Office Detective Sergeant Nicole Bradley; and (4) Jersey City Police Detective William Costigan. (collectively referred to as "the law-enforcement witnesses").[1]

---

[1] The Government referred to these witnesses as "hybrid fact/expert witnesses" and noticed them as expert witnesses "in an abundance of caution." Expert Notice at 2.

The Government advised that none of the law-enforcement witnesses has testified as an expert in the last four years or even provide a case citation in which any were qualified as an expert at any point in the past. It also failed to provide: (1) publications authored by the law-enforcement witnesses; and (2) expert qualifications for these witnesses. *See* Expert Notice at 5.  Undaunted by the lack of quantifiable expert qualifications, the Government intends to rely on the law-enforcement witnesses to testify across a broad array of topics that will have significant bearing on the ultimate guilt or innocence of the defendants.

Specifically, the Government advised that these witnesses will testify as to the existence of the NHB enterprise, historical and ongoing feuds between the NHB and rival neighborhood-based enterprises, and hand signs, tattoos, and other identifiers that are indicative of membership in, or association with, the NHB Enterprise and rival neighborhood-based enterprises. *See* Expert Notice at 5. Notably absent for each of the law-enforcement witnesses is a complete statement of all of their opinions and a detail bases and reasons for those opinions. The Government only vaguely disclosed categories of testimony, not opinions.

### 1.  The Government's Expert Disclosure is Insufficient

The Government's expert disclosure for its law-enforcement witnesses is insufficient under Federal Rule of Criminal Procedure 16 and Federal Rule of Evidence 702.

Rule 16(a)(1)(G) allows the government to provide a written summary as opposed to tendering an expert report. The Rule, however, requires very specific information to be included in the disclosure:

> At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial.
> […]
> The summary provided under this subparagraph **must describe the witness's opinions, the bases and reasons for those opinions**, and the witness's qualifications.

*See* Fed. R. Crim. P. 16(a)(1)(G) (emphasis added).

When a party fails to comply with the requirements of Rule 16, as the Government has done here, the Court has the sound discretion to "prohibit that party from introducing the undisclosed evidence." See Fed. R. Crim. P. 16(d)(2)(C). *See United States v. Millhouse*, 346 Fed. Appx. 868 (3d Cir. 2009); *United States v. Lopez*, 271 F.3d 472 484 (3d Cir. 2001). As the Notes of the Advisory Committee on the Rules states in its 1966 Amendment:

> The second sentence [of subdivision (g)] gives wide discretion to the court in dealing with the failure of either party to comply with a discovery order. Such discretion will permit the court **to consider the reasons why disclosure was not made, the extent of the prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances**.

*See* Fed. R. Crim. P. 16(a)(1)(G), Notes of Advisory Committee on Rules - 1966 Amendment, Subdivision (g) (emphasis added). *See also United States v. Taylor,* 71 F. Supp. 2d 420, 422 (D.N.J. 1999) (*citing United States v. Charley*, 189 F.3d 1251, 1261 (10th Cir. 1999)) (*quoting United States v. Gonzales*, 164 F.3d 1285, 1292 (10th Cir.1999)).

In addition to the disclosure requirement of Rule 16(a)(1)(G), Rule 702 of the Federal Rules of Evidence restricts the testimony of a witness qualified as an expert unless four specific criteria are met:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles
and methods to the facts of the case.

*See* Fed. R. Evid. 702 (emphasis added).

Given the absence of required information in the disclosure, the Court has no means of determining the bases of the testimony, much less what it is the product of and what methods the witness employed. Therefore, the only appropriate remedy is preclusion.

## 2. The Law-Enforcement Witness Testimony is Inadmissible

In addition to the insufficiency of the Government's expert submissions, the defense objects to this evidence on the grounds that it contains impermissible hearsay evidence and violates the confrontation clause.

The Government argues that Brown and Shaw murdered Ishear Bailey ("Bailey"), a high-ranking member of Sex, Money, Murder ("SMM"), NHB's rival in Jersey City. (Gov't Mot., at 2). Part of its theory of prosecution is that Bailey's murder "stemmed from a long-running feud" between NHB and SMM, during which SMM members were responsible for the deaths of HNB members, including Brown's brother. (Gov't Mot., at 2). The Government intends to introduce this potentially powerful motive evidence through the law-enforcement witnesses. Brown objects to this

evidence on the grounds that it contains impermissible hearsay evidence and violates the confrontation clause.

### a.    The Anticipated Testimony Will Be Based Largely and Improperly on Hearsay

Notwithstanding Brown's objections to the law-enforcement witnesses' qualifications to testify as experts, the Court should preclude their testimony as hearsay. The proposed testimony from the law-enforcement witnesses – most notably, regarding the existence of the NHB enterprise, historical and ongoing feuds between the NHB and rival neighborhood-based enterprises – at best can only be obtained through hearsay.

While an expert may rely on hearsay in providing his opinion, an expert may not merely repeat the hearsay relied on. Fed. R. Evid. 703; *United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003); *United States v. Mejia*, 545 F.3d 170, 197 (2d Cir. 2008). When an expert is no longer applying his extensive experience and a reliable methodology, his testimony should be excluded. *Dukaghimi*, 326 F.3d at 58. Thus, an expert may rely on hearsay evidence while reliably applying expertise to that hearsay evidence, but may not rely on hearsay for any other aspect of his or her testimony. *Id*.

In *Dukaghimi*, the Second Circuit held that an expert improperly relied on his conversations with cooperating individuals and cooperating defendants to interpret words in recorded telephone calls. The expert "was

not translating drug jargon, applying expert methodology, or relying on his general experience in law enforcement. Rather, he was relying on his conversations with non-testifying witnesses and co-defendants in order to prove 'the truth of the matter asserted' about the meaning of the drug conversations." *Id*. at 59. There, the expert improperly repeated hearsay without applying expertise to the hearsay, thereby allowing the government to circumvent the rules prohibiting hearsay. *Id*.

Similarly, in *United States v. Mejia*, a gang expert relied on hearsay including statements by gang members given in interviews both custodial and non-custodial, statements made by other law enforcement officers, statements from intercepted telephone conversations and printed and online materials. The Second Circuit held that an expert cannot merely transmit the hearsay to the jury. Rather, the expert has to form his or her own opinions by applying his experience and a reliable methodology to the inadmissible materials. 545 F.3d at 197.

### b.    The Anticipated Testimony Violates the Confrontation Clause

This hearsay testimony also violates the Confrontation Clause. *See Crawford v. Washington*, 541 U.S. 36 (2004). The *Mejia* court noted that an officer's "expert" testimony violates *Crawford* if it communicates out-of-court statements of cooperating witnesses or confidential informants directly

to the jury in the guise of an expert opinion. *Mejia*, 545 F.3d at 198 (*citing United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007)). There, the "expert" testified to the existence of a "drug tax" within the gang. This testimony was based on the statements of gang members who were in custody. Consequently, they were testimonial statements whose introduction violated the defendant's rights under the Confrontation Clause. *Mejia,* at 199. Thus, this Court should ensure that no "expert testimony" results in the admission of testimonial hearsay or introduces inadmissible hearsay.

The Second Circuit concluded: "The Government cannot take a shortcut around its obligation to prove murder beyond a reasonable doubt just by having an expert pronounce that unspecified deaths of eighteen to twenty-three persons have been homicides committed by members of [the gang]." *Mejia,* 545 F.3d at 195-196. Much of the expert's testimony in *Mejia* concerned materials well within the grasp of the average juror. *Id*. at 194. No expertise was required to understand the facts asserted in the expert's testimony. Had the Government introduced lay witness testimony, arrest records, death certificates, and other competent evidence of these highly specific facts, the jury could have intelligently interpreted and understood them. *Id*. at 195.

If the Court determines the Government's disclosure was sufficient, it must preclude the law-enforcement witnesses' testimony because it such testimony because it improperly relies on hearsay evidence and violated the Confrontation Clause.

**Point VII**

**The Government Should Be Precluded From Introducing
Autopsy and Crime-Scene and Photographs of the Victims**

The Government's trial exhibits contain multiple color autopsy photographs of the three murder victims. The photographs are graphic, disturbing, and include images of the victims' naked bodies and close-up images of bullet wounds and punctured organs.

Here, the manner of death is not in dispute for any of the three victims. There is no dispute that, as stated in the autopsy reports, each of the victims died from gunshot wounds. Because the autopsy photographs are not relevant to the resolution of any disputed point in trial nor do they otherwise help the jury in a factual determination, and because they are highly prejudicial and serve only to inflame the jury, they should be precluded under Federal Rules of Evidence 401 and 403. *See United States v. Eyster*, 948 F.2d 1196, 1212 (11th Cir. 1991).

A court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair

prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. In the criminal context, unfair prejudice "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). While the defense concedes that Rule 403 generally favors the admission of relevant evidence and exclusion of relevant evidence is rarely required. *See United States v. Universal Rehabilitation Services (PA), Inc*., 205 F.3d 657, 664 (3d Cir. 2000). The Court should conduct a balancing test to avoid cumulative admission of otherwise relevant evidence.

If the Court does not bar the Government from introducing autopsy photographs of the victims, then it should use its discretion to bar cumulative and highly inflammatory photographs. *See United States v. Escalante-Melgar*, 567 F.Supp.3d 485 (2021) (Judge Cecchi) (Court excluded the full version of a video to avoid exposing the jury from viewing the moment a victim was murdered and limited the number of crime scene and autopsy photographs the Government was permitted to introduce into evidence).

To that end, Brown asks that the Court preclude all autopsy photographs of the victims and the following crime-scene photographs:

Government Exhibits 101-21, 101-39, 101-61, 101-81, 101-88, 101-142, 101-143, 101-151, 101-152, 101-153, 101-154, 101-155, 101-157, 101-158, 101-163, 101-164, 101-165, and 101-166.

**Point VIII**

**The Court Should Preclude Jail Recordings
Not In Furtherance of the Conspiracy**

Brown seeks to preclude Government Exhibits 320, 321, 322, and 323; jail recordings between an incarcerated Noel Salgado ("Salgado") and third parties. The speakers have no personal knowledge of the events discussed, including the murders that appear to be the subject of this prosecution. There is no evidence the speakers, including Salgado, were members of the alleged murder conspiracy or that their statements were made in the course of and in furtherance of the conspiracy. In fact, the substantive conversations appear to be nothing more that gossip.

- **Government Exhibit 302**: Is a conversation between Salgado and an unidentified, possibly female, speaker. Several minutes into the conversation it appears that Salgado references "Sayboy" (The Government contends is Brown's nickname) feuding with people, including who the Government is likely to argue is victim Ishear Bailey.

- **Government Exhibit 321**: Is a conversation between Salgado and an unidentified male speaker. There is another reference to "Sayboy" "going at them Parkside n*****," which perhaps the Government will contend supports its theory of an ongoing dispute between Brown and rival gang members.

- **Government Exhibit 322**: Is a conversation between Salgado and an unidentified male speaker, after the murders, discussing limited details about the charged murder, including identifying the victims and reference to the use of a U-Haul to carry out the murders. There does not appear to be any reference to Sayboy, but there is refence to the murderer robbing a chain that does not belong to him, which the Government is likely to contend is Brown.

- **Government Exhibit 323**: Is an undated conversation between Salgado and unidentified male speakers where he sends congratulations for "doing it."

"[A] statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. Fed.R.Evid. 801 (d)(2) (E). To admit such statements, the prosecution must prove by a preponderance of the evidence that "(1) a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy." *United States v. McGlory*, 968 F. 2d 309, 333 (3d Cir. 1992), *cert. denied*, 113 S.Ct. 415 (1993). *See also United States v. Ellis*, 156 F.3d 493, 496 (3d Cir.1998); *United States v. Vega*, 285 F.3d 256, 264 (3d Cir.2002); Rule 801(d)(2)(E).

A declaration by one alleged co-conspirator is admissible against another only when there is a "sufficient showing, by independent evidence, of a conspiracy among one or more other defendants and the declarant and if

the declarations at issue were in furtherance of that conspiracy." *James*, 590 F.2d at 581, citing, *United States v. Nixon*, 418 U.S. 683, 701 (1974); see also *Ammar*, 714 F.2d at 246 n.3 ("preliminary determinations as to the admissibility [of co-conspirator statements] must be made on the basis of independent evidence"), citing, inter alia, *Gov't of the Virgin Islands v. Dowling*, 633 F.2d 660, 665 (3d Cir. 1980), *United States v. Trowery*, 542 F.2d 623, 627 (3d Cir. 1976) (*per curiam*). Indeed, "substantial, independent evidence of a conspiracy" is required prior to the admission of co-conspirator statements. *James*, 590 F.2d at 581, citing, *Nixon*, 418 U.S. at 701 n.14. The burden of proof is on the Government to make this showing by a preponderance of the evidence. *United States v. Gambino*, 926 F.2d 1355, 1360 (3d Cir. 1991).

Although the in-furtherance requirement is usually given a broad interpretation by the Courts (*United States v. Duka*, 671 F.3d 329, 348 (3d Cir. 2011), statements made by a co-conspirator to non-involved parties are not in furtherance of a conspiracy, even if conspirator explicitly references the underlying conspiracy. *United States v. Provenzano*, 620 F.2d 985, 1001 (3d Cir. 1980). In *Provenzano*, the court ruled that statements made from two "errand boys" were not made in furtherance of the conspiracy because

they were not involved in or privy to the details of the underlying conspiracy. *Id*.

Even if Salgado and the other participants were Brown's co-conspirators, the defense argues that the statements were not made in furtherance of the charged conspiracy – the murder of Bailey. Conversations between co-conspirators that are not intended to induce continued involvement, or any actions that would not advance a conspiracy, are not in furtherance of a conspiracy. *United States v. Gibbs*, 739 F.2d 838, 845 (3d Cir. 1984). For example, statements by co-conspirators are not admissible if they amount to no more than "mere narratives" of past events. *United States v. Ammar*, 714 F.2d 238, 252 (3d Cir. 1983). *See also, United States v. Lieberman*, 637 F.2d 95, 103 (2d Cir. 1980) (holding that a casual conversation between the co-conspirator and witness was not in furtherance of the conspiracy because it amounted to "idle chatter"), *United States v. Quinones-Davila*, 2018 WL 2392753 (D.Virgin Islands, 2018) at *1 (a mere narration of a past event is not in furtherance of a conspiracy").

Accordingly, Government Exhibits 320, 321, 322, and 323 should be precluded.

In the alternative, to minimize the risk of undue prejudice and protect Brown's right to a fair trial, the Court should direct the prosecution to

disclose all alleged coconspirator statements it has in its possession and should conduct a *James* hearing to determine their admissibility and in some cases, their audibility. By "counsel[ing] that the practice of admitting conspirator hearsay statements subject to later connection 'be carefully considered and sparingly utilized by the district courts,'" the Third Circuit has adopted this strong preference for *James* hearings. *See United States v. Gambino*, 926 F.2d 1355, 1360 (3d Cir.), *cert. denied*, 111 S.Ct. 2800 (1991) (citing *United States v. Continental Group, Inc.*, 603 F.2d 444, 457 (3d Cir. 1979)).

**Point IX**

**Court Should Preclude Government Exhibit 237**

Government Exhibit 237 is an almost two-minute video. The first five seconds of the video portrays an unknown young black male (possibly in his early teens) standing outside of a residential building who says, "Yeah, I'm still messing with these [inaudible] out here. These out here rowdy now. Now we got to get rowdy." (A draft transcript of Exhibit 237 is attached as Exhibit B for the Court's convenience). The video then fades to a different location and features an interview with Tyrell Franklin ("Franklin") – since deceased – by an unknown interviewer, who asks Franklin about gang violence in the neighborhood and how it will end. Notably, Franklin does

not refer to any specific acts of violence and does not refer to Brown or Shaw. The date the video was recorded is not discernable.

We expect that the Government will attempt to prove he was a member or associate of NBH and was murdered by Bailey. Apart from its the lack of relevance, the recordings constitute inadmissible hearsay that does not fall under any exception.

### 1. Exhibit 237 Not Admissible Under Federal Rule of Evidence 803(3)

*Then-Existing Mental, Emotional, or Physical Condition*. A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

The first five seconds of the video has no discernable connection to the defendants and it should be excluded from evidence solely based upon lack of relevancy and Federal Rule of Evidence 401. The remainder of the video demonstrates precisely why it cannot be admitted under FRE 803(3). When asked "So how is it going to end?", Franklin responds with extensive factual assertions about gang behavior and violence, stating:

> "It's going to end like how like most like I say like if we see each other like we going to bump heads... Motherfuckers just killing each other. Over this gang shit... They take one of ours, we going to take

> one of theirs. That's how that shit must basically play... You going to be in jail, you going to be in there, son... Get out the game or you going to be out here getting money. You going to be dead."

Franklin also discusses territory disputes ("All over some gang shit, son. Over turf, over territory, man") and makes factual assertions about other (unspecified) gang members' authenticity ("These n****as fake banging. These n***as ain't banging for real"). *See* Exhibit B.

Rule 803(3) serves a narrow purpose: to allow admission of statements that demonstrate the declarant's contemporaneous mental or emotional condition. However, it expressly excludes "statements of memory or belief to prove the fact remembered or believed." This exclusion prevents the hearsay exception from being used as a vehicle to admit factual assertions about past events under the guise of present state of mind.

### 2. **Exhibit 237 Not Present State of Mind**

The content of the video makes clear that this is not an expression of present emotional or mental condition, but rather a detailed factual analysis of gang dynamics and predictions about future violence. This analysis directly contradicts established Third Circuit precedent.

In *United States v. Palma-Ruedas*, 121 F.3d 841 (3rd Cir.1997) the Third Circuit affirmed the District Court's exclusion of testimony that a witness had said, "nice to meet" you when introduced to another person. The proponent wanted to use the statement as evidence that the two had not previously met. The Court concluded that use of the statement was improper because "statements offered to support an implied assertion are inadmissible hearsay."

Here, Franklin's statements about territory disputes ("All over some gang shit, son. Over turf, over territory, man") and assessments of other gang members ("These n***as fake banging") could be used to support an implied assertion the defendants acted in accordance with the description of gang violence described by Franklin in the video. His statements are precisely the type of "statements of memory or belief to prove the fact remembered" that Rule 803(3) expressly excludes.

3. **Predictions About Future Violence Exceed Rule 803(3)'s Scope**

When asked how gang violence will end, Franklin responded with detailed predictions: "They take one of ours, we going to take one of theirs. That's how that shit must basically play." This constitutes a factual

prediction about future conduct of third parties, not an expression of his then-existing emotional state.

### 4. **Analytical Discourse Rather Than Emotional Expression**

The video shows the declarant engaged in analytical discourse about gang dynamics, explaining territorial disputes, assessing other gang members' authenticity, and predicting future violence patterns. This deliberative analysis bears no resemblance to the spontaneous expressions of emotion, fear, pain, or other mental conditions that Rule 803(3) is designed to capture.

As the Advisory Committee Notes explain, the rule is "essentially a specialized application" of present sense impression principles, not a broad exception for any statement that might tangentially relate to someone's state of mind.

### 5. **The Statement Lacks Required Contemporaneity Under Third Circuit Precedent**

In *Packgen v. Berry Plastics Corp*., 847 F.3d 80, 91 (1st Cir. 2017), the First Circuit held that FRE 803(3) requires "contemporaneity between the event that gives rise to the state of mind or intention and the declarant's expression of that state of mind or intention." While this is First Circuit

precedent, it has been favorably cited across circuits and represents the prevailing view on contemporaneity requirements.

Here, the government has provided no foundation establishing when this video interview was conducted in relation to any specific events that might have given rise to a particular state of mind. Without such temporal connection, the statement appears to be a general observation about neighborhood conditions rather than an expression of then-existing emotional or mental condition triggered by specific contemporaneous events. Moreover, the interview format itself suggests deliberation and reflection, rather than the spontaneous expression of present mental state that the exception is designed to capture.

## 6. The Interview Format Demonstrates This Is Not Contemporaneous Expression of Present Mental Condition - It Lacks Reliability Guarantees

The Third Circuit recognizes that Rule 803(3) must be applied with caution to prevent admission of self-serving statements that lack the reliability guarantees underlying the hearsay exception. "[R]eliability of the reporting of the hearsay by the witness" is a proper part of trustworthiness analysis for hearsay exceptions. (*United States v. Bailey*, 581 F.2d 341, 349 (3d Cir. 1978).

Government Exhibit 237's video interview format presents exactly the type of circumstance where the declarant might have opportunity for reflection and potential fabrication. Unlike spontaneous expressions of emotion or physical condition, the formal interview setting provided opportunity for deliberation and narrative construction.

### 7. **Reflective Nature of Responses**

The interviewer's question ("So how is it going to end?") and the declarant's lengthy, analytical response show this was a formal interview seeking factual information, not a contemporaneous expression of emotion or mental state. The declarant's detailed analysis of gang dynamics, assessment of other members' authenticity, and predictions about future violence demonstrate reflection and deliberation rather than spontaneous expression of present mental condition.

### 8. **Application to Gang Violence Content**

The video's extensive discussion of gang activities, territorial disputes, and violence patterns constitutes precisely the type of character evidence that Rules 404(b) and 608 are designed to exclude. The government cannot circumvent these protections by claiming such evidence represents "state of mind."

The declarant's statements about gang authenticity ("These niggas fake banging") and territorial disputes serve no purpose other than to establish the general character of gang operations and relationships—evidence that would be inadmissible under other rules.

9. **The Probative Value Is Substantially Outweighed by Unfair Prejudice Under FRE 403**

The Third Circuit regularly conducts careful FRE 403 balancing to exclude prejudicial evidence. The video's graphic content about gang violence, retaliation, and territorial disputes presents extreme risk of unfair prejudice.

- **Inflammatory Gang Violence Content**: References to "Motherfuckers just killing each other," retaliatory violence, and territorial disputes will inflame the jury against defendant regardless of actual relevance to the specific charges.

- **Improper Character Propensity Reasoning**: The jury will inevitably use evidence about gang culture and violence for forbidden character propensity reasoning rather than legitimate state-of-mind purposes.

- **Minimal Probative Value for Defendant's Specific Motive**: The general discussion of gang dynamics provides

minimal, if any, probative value regarding defendant's specific mental state or motive for the alleged murders.

- **Risk of Confusion and Prejudice**: The video's lengthy discussion of multiple gang conflicts, territorial disputes, and various individuals will confuse the issues and distract the jury from the specific charges against defendant.

For all the above reasons the Court should exclude Government Exhibit 237 from being admitted into evidence.

## Point X

### Court Should Permit Brown to File
### Additional Motions as May be Necessary

Counsel has endeavored to bring all motions applicable at this time, but request leave to bring any additional motions that may become necessary based upon the Government's response to the present motions or new facts uncovered by the defendant's ongoing investigation into this case.

## <u>Conclusion</u>

For the reasons set forth above, Brown respectfully requests the opposed Government's *in limine* motions be denied and Brown's *in limine* motions be granted.

Respectfully submitted,

/s/ Stephen Turano
/s/ Thomas Ambrosio

Stephen Turano, Esq.
Thomas Ambrosio, Esq.
    Attorneys for Markell Brown

cc:  counsel of record (via ECF)